******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CONNECTICUT
STATE UNIVERSITY ORGANIZATION OF
ADMINISTRATIVE FACULTY, AFSCME,
COUNCIL 4, LOCAL 2836, AFL-CIO
(SC 20628)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker and Alexander, Js.

*Syllabus*

The plaintiff, the state of Connecticut, sought to vacate, and the defendant union sought to confirm, an arbitration award reinstating the grievant union member to his employment as the director of student conduct at a state university. In that position, the grievant was responsible for enforcing the student code of conduct, and his job duties required him to investigate violations of that code and to work closely with the student body, the faculty, and the local police, among others. The grievant's employment had been terminated in connection with a domestic dispute involving his wife. On the night of the dispute, the grievant's wife left their home and called the police, claiming that the grievant had threatened to kill himself and her, and expressing concern for the safety of their children, who were still in the home. In response to the police presence around the home, the grievant called the police department and told the dispatcher that, although he had guns in the home, he would not harm law enforcement or his children. The grievant refused to open the door for the police officers on the scene but was told that he would receive a call from another police officer, M, and that M would discuss the grievant's exit from the home and subsequent arrest. After M called the grievant, the grievant exited the home and was arrested without incident. Two weeks after the event, the grievant's wife sought and obtained a civil protective order. The Department of Children and Families (DCF) also made a determination that the grievant had physically neglected his children, which was later reversed on appeal as unsubstantiated. In addition, the state had charged the grievant with various criminal offenses, including kidnapping in the first degree and risk of injury to a child, but all of the charges ultimately were dismissed. While the criminal charges and the investigation by DCF were pending, the university conducted its own investigation and subsequently informed the grievant that his employment was being terminated as a result of his off-duty conduct, which, the university contended, rendered him unsuitable to fulfill his professional responsibilities as the university's director of student conduct. The union contested the grievant's discharge, and, pursuant to the parties' collective bargaining agreement, an arbitration hearing was held to determine whether the grievant's dismissal was for

just cause and, if not, the appropriate remedy. After hearing testimony from the parties' witnesses, including the grievant and his wife, and after considering other evidence, the arbitrator concluded that the university did not have just cause to terminate the grievant's employment. The arbitrator acknowledged that the case centered on the credibility of the grievant and his wife, both of whom described entirely different versions of the events in question. The arbitrator ultimately found that there was compelling evidence that called into question the wife's version of the events and that the grievant's testimony was credible and corroborated by other evidence in the record. Accordingly, the arbitrator ordered the reinstatement of the grievant to his position of director of student conduct. In its application to vacate the arbitration award, the state contended that the award violated public policy. Specifically, the state claimed that the grievant's reinstatement violated the public trust because his actions, for which he was discharged, had a direct nexus with his professional responsibilities and because his reinstatement would have a detrimental effect on his working relationships with students, faculty, and law enforcement, among others. The trial court rendered judgment granting the state's application to vacate the award and denying the union's motion to confirm the award, from which the union appealed.

*Held* that the state failed to demonstrate that enforcement of the arbitration award reinstating the grievant to his position of director of student conduct violated public policy, and, accordingly, this court reversed the trial court's judgment and remanded the case with direction to grant the union's motion to confirm the award and to deny the state's application to vacate the award:

This court assumed, for purposes of this appeal, that the arbitration award reinstating the grievant implicated the explicit, well-defined, and dominant public polices of protecting victims of domestic violence, protecting children, and preventing interference with or endangering the police, but, after applying the factors enumerated in *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199* (316 Conn. 618), that a reviewing court should consider in evaluating whether an arbitration award reinstating a discharged employee violates public policy, it could not conclude that the award reinstating the grievant in the present case violated those public policies.

With respect to the first factor, there was no statute, regulation, or case law that mandated the termination of the grievant's employment, and, even if this court agreed with the state that the grievant's behavior had violated the university's code of conduct, that code of conduct did not require or recommend the termination of the grievant's employment, and the collective bargaining agreement expressly provided for progressive discipline.

Moreover, even if the grievant's off-duty conduct had violated the strong public policies against domestic violence and in support of cooperation with the police and child safety, a reviewing court must determine, on the basis of the facts found by the arbitrator, only whether any explicit public policy prohibits the arbitration award, that is, the grievant's reinstatement, and no such public policy was identified in the present case.

With respect to the second factor, regarding whether the nature of the employment at issue implicates public safety or the public trust, this court agreed with the state that the grievant occupied a position of public trust, but it could not conclude, in light of the record in the present case, that the grievant's reinstatement would impair the public trust, especially when there was undisputed evidence that other university employees who occupied positions of public trust had been arrested for off-duty conduct and were not subject to termination or even discipline, and the university had failed to present any significant evidence demonstrating why the grievant's off-duty conduct so impaired the public trust that termination of his employment was required.

With respect to the third factor, the factual findings of the arbitrator, which were not subject to judicial review, did not compel this court to conclude that the grievant's off-duty conduct was so egregious that public policy required the termination of his employment.

Specifically, as to the domestic violence charges and the grievant's actions relating to his children, the arbitrator observed that a trial court had dismissed all of the criminal charges against the grievant and that DCF's determination that the grievant had physically neglected his children was reversed on appeal as unsubstantiated, the arbitrator did not credit the allegations of domestic abuse or the wife's claim that the criminal charges had been dropped at her request, and the arbitrator found that the grievant's children were asleep and undisturbed during the entire incident.

Although the grievant's actions, as they related to his interference with the police officers, were not to be condoned, the question was not whether the grievant engaged in misconduct but, rather, whether, on the basis of the facts found by the arbitrator, the harms imposed and risked created by the grievant's conduct were so severe that public policy required the termination of his employment, and this court's review of the arbitrator's decision demonstrated that the arbitrator considered the grievant's fears related to the police presence and his concerns for his own safety to be credible and concluded that those fears and concerns served as mitigating factors with respect to the grievant's failure to immediately comply with the instructions of the police during the incident, especially when the grievant ultimately complied with those instructions and surrendered after being assured of his safety by M, and the

grievant was not charged with, let alone convicted of, any crimes relating to his interactions with the police.

Furthermore, the state failed to satisfy its burden of establishing that reinstatement of the grievant to his position as the university's director of student conduct would send an unacceptable message to students and other employees of the university, or that the potential impact of the grievant's conduct on individuals who were not parties to the collective bargaining agreement was so negative as to require the termination of his employment, as the university introduced only limited evidence to demonstrate that the incident had any impact on its students and no evidence to support its claim that there would be a negative impact on other employees, whereas the union had presented evidence, which the arbitrator credited, that university employees would not be negatively impacted by the grievant's reinstatement.

In addition, the arbitrator explicitly rejected the university's claim, which the state also raised on appeal, that the grievant's credibility with law enforcement had been seriously undermined as a result of his off-duty conduct, and it was undisputed that that conduct did not occur during the performance of the grievant's official duties but, instead, occurred at the grievant's home and involved a highly personal issue.

With respect to the fourth factor, this court concluded that the grievant was not so incorrigible as to require the termination of his employment, as the arbitrator did not make any finding indicating that the grievant was incorrigible, there was nothing in the record to suggest that the grievant would likely recidivate, and there was evidence that the grievant had successfully completed a therapeutic domestic violence offender program.

(*Two justices dissenting in one opinion*)

Argued November 21, 2022—officially released June 4, 2024

*Procedural History*

Application to vacate an arbitration award, brought to the Superior Court in the judicial district of Hartford, where the defendant filed a motion to confirm the award; thereafter, the case was tried to the court, *Hon. Robert B. Shapiro*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment granting the plaintiff's application to vacate and denying the defendant's motion to confirm, from which the defendant appealed. *Reversed*; *judgment directed.*

*Kelly A. Rommel*, for the appellant (defendant).

*Maria C. Rodriguez*, former assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Matthew Larock*, former deputy associate attorney general, for the appellee (plaintiff).

*Opinion*

MULLINS, J. This case presents the question of whether the public policy of this state is violated by an arbitration award ordering the reinstatement of a public sector employee whose employment was terminated after being arrested and charged with crimes involving off-duty conduct. The defendant, the Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO (union), appeals from the judgment of the trial court rendered following the court's denial of the union's motion to confirm an arbitration award that reinstated the grievant,[1] a union member, to his employment at Central Connecticut State University (university). The court denied the union's motion to confirm the award, granted an application to vacate the award filed by the plaintiff, the state of Connecticut (state), and rendered judgment thereon, after concluding that the award violated public policy. We disagree that the arbitration award, which reinstated the grievant, violated an explicit, well-defined and dominant public policy and, therefore, reverse the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. At the time of the incident in question, the grievant had been employed by the university as the director of student conduct for approximately fifteen years, and there was no evidence

[1] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

of previous discipline. As the director of student conduct, the grievant was responsible for enforcing the student code of conduct, and, to fulfill his responsibilities, he had to investigate violations of that code. As part of his job duties, he worked closely with the student body, the faculty, the local community, and the local police.

On April 24, 2018, the grievant's wife (wife) called the police and reported that she had left their home after an altercation with the grievant and that she was concerned about the safety of their children, who were still in the home. She told the dispatcher that her husband had threatened to kill her, was going to kill himself, and was " 'drunk.' " When Scott Parker, an officer with the Hartford Police Department, arrived, the wife, dressed in her pajamas and a bathrobe, ran up to him and pointed to her home. She reported that the grievant had grabbed her around the throat, began strangling her, and forced her down the stairs to the basement, where he bound her hands and mouth with duct tape. She later testified that she vomited in the basement as a result of his behavior. Officer Parker indicated in his report that he observed red marks around her neck and scratches on her face, but she declined medical treatment.

Officer Parker approached the home and saw the grievant in a second floor window. The grievant called to him, saying, "just come get the kids. I'm not coming out, and I'm not staying in the window." (Internal quotation marks omitted.) In response to the police presence around his home, at 12:12 a.m. on April 25, 2018, the grievant called the Hartford Police Department. During this phone call, he told the dispatcher that he wanted someone to come in to get his children. The grievant told the dispatcher that he had guns in the home but informed the dispatcher, "I will not harm any law enforcement. . . . I will not harm my kids." (Internal quotation marks omitted.) When the dispatcher asked the grievant if he

could unload his firearms, the grievant responded, "I cannot." (Internal quotation marks omitted.)

The grievant refused to open the door for the police officers on the scene but told the dispatcher that he was willing to talk to an officer on the scene if the officer would call his cell phone. He then received a call from an officer on the scene, whom he referred to as Chris. He had several conversations with Chris. At 12:31 a.m., Chris told the grievant to " 'sit tight,' " that the grievant would receive a call from Officer Mark Manson, and that Officer Manson would discuss the grievant's exit from the home and subsequent arrest.

At 1:38 a.m., nearly one and one-half hours after the grievant initiated contact with the police, Officer Manson contacted the grievant. The grievant and Officer Manson had numerous conversations. Within one hour, the grievant exited the home and was arrested without incident. The grievant's children were asleep and undisturbed during the entire incident.

The police transported the grievant to the hospital for evaluation, a breath test for alcohol and a drug test. The result of the breath test revealed a blood alcohol content of 0.0 percent, and the result of the drug test was negative. On April 25, 2018, the university placed the grievant on administrative leave, pending an investigation. Two weeks after the incident, the wife sought and obtained a civil protective order for one year. The Department of Children and Families also made a determination of physical neglect against the grievant, which was later reversed as unsubstantiated.

Criminally, the state charged the grievant with one count each of kidnapping in the first degree, strangulation in the first degree, threatening in the second degree, assault in the third degree, and breach of the peace in the second degree, and two counts of risk of injury to a child. All of these charges were ultimately dismissed

by the trial court on November 14, 2019, pursuant to an oral motion to dismiss filed by the grievant.

While the criminal charges and the investigation by the Department of Children and Families were pending, the university's chief human resources officer, Anna Suski-Lenczewski, conducted an investigation. In a letter of termination sent to the grievant, Suski-Lenczewski explained: "Your dismissal is for off-duty behavior on the night and early morning of April 24–25, 2018, [that] resulted in a response from the Hartford Police Department and its [e]mergency [r]esponse [t]eam. This behavior created a hazardous situation, placing your spouse, [your] children, police personnel, and yourself at risk [of] grave harm. The seriousness of this misconduct renders you unsuitable to discharge your professional responsibilities as [d]irector of [s]tudent [c]onduct and forms the just cause basis for your termination in accordance with [a]rticle 20.1 of the [collective bargaining agreement between the university and the union]."[2]

The union contested the termination of the grievant's employment. On July 20 and 24, and August 17, 2020,

---

[2] The parties' collective bargaining agreement provided in relevant part:

"20.1 Discipline of a member under this [a]rticle may include any written reprimand, demotion, suspension with or without pay, or dismissal from service. The [university] subscribes to the principles of progressive discipline. No disciplinary action shall be instituted against any bargaining unit member without just cause. Any disciplinary action shall be predicated upon written charges related directly and substantially to the alleged unsuitability of the member to discharge his professional responsibilities. Discipline shall not be used to restrain members in the exercise of academic freedom or other rights of citizens.

\* \* \*

"20.4 If a disciplinary grievance proceeds through arbitration, the arbitrator may:

"(1) approve the disciplinary action imposed by the [u]niversity;

"(2) reduce or modify such penalty as appropriate under the circumstances; [or]

"(3) eliminate the penalty with a purging of the record and restoration of all pay and benefits."

pursuant to a grievance procedure provision in the parties' collective bargaining agreement, an arbitration hearing was held to determine the issues of (1) whether the dismissal of the grievant was for just cause, and (2) if not, what should be the remedy, consistent with the agreement.[3] The university presented the testimony of four witnesses at the hearing: Suski-Lenczewski, who testified about the investigation; the university's vice president for student affairs, who testified about the grievant's job duties; Officer Parker, who confirmed several aspects of the police incident report; and the grievant's wife, who corroborated the statements she made during her 911 call to the police and testified that she sought a protective order after the incident.

The union presented thirteen witnesses at the hearing, including the grievant, the university's chief administrative officer, a sergeant with the university's police department, other university employees, and former students. The union also presented the testimony of a licensed clinical social worker, who testified that the grievant had participated in and completed a therapeutic domestic violence offender program after his arrest and had continued work beyond that 6 month course, completing a total of approximately 150 sessions.

The union presented undisputed evidence that the university had no history of disciplining any employee for an off-duty arrest and that no members of the bargaining unit had ever been disciplined for their off-duty conduct. Indeed, the union presented evidence that at least two university employees were arrested for public indecency, including a professor, the university's president was arrested for impersonating a police officer, and another employee was arrested for harassment, but

---

[3] The union also alleged that the university had not provided specific written charges to the grievant, as required by the collective bargaining agreement. The arbitrator ultimately rejected this claim, which is not part of this appeal.

none of those employees was disciplined, let alone terminated.

The arbitrator issued his decision on November 30, 2020, concluding that the university did not have just cause to terminate the employment of the grievant. In reaching his decision, the arbitrator acknowledged that "[t]his case centers on the credibility of the two main participants to this event, the grievant and his wife . . . . Each has an entirely different version of the events of that evening. In this case, the university has made a determination that [the wife's] version is the more credible, claiming that it has established the appropriate nexus between the grievant's job duties and the events on the evening of April 24, 2018."

The arbitrator then focused on the investigation conducted by the university, explaining that "[the wife] did not speak to the university's representative during the investigation regarding the events of the night of April 24, 2018, and did not appear at the *Loudermill* [hearing].[4] The university reached [its] conclusion [on the basis of] the police incident report, which the university claims gave . . . Suski-Lenczewski 'more than a reasonable basis to credit as true' . . . [the wife's] sworn testimony at the hearing regarding her petition for a protective order, the notice of pending charges taken from the Judicial [Branch's] Internet website, and conversations . . . Suski-Lenczewski had with the university's police chief and a deputy police chief for the city of Hartford." (Citation omitted; footnote added; footnote omitted.)

---

[4] " '[A] tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story' before termination. *Board of Education* v. *Loudermill*, [470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)]. The opportunity to present one's 'side of the story' is generally referred to as a *Loudermill* hearing." *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 243 n.3, 117 A.3d 470 (2015).

The arbitrator reasoned: "Admittedly, the character of [the wife's] testimony is such that it is difficult to believe that she would fabricate such a story. And the grievant's contention that [his wife] made false allegations so that she could easily extricate herself from the marriage seems, at first blush, difficult to believe. A fact finder in any such case cannot determine what actually happened but only what probably happened. In trying to make that assessment, I find that there is compelling evidence that calls into question the narrative as reported by the incident report and [the wife's] testimony before the court in the protective order proceeding."

The arbitrator then went on to detail that the incident report contained only the statement of the wife and the impressions of Officer Parker, the arresting police officer. The criminal charges were dismissed upon the granting of the grievant's oral motion to dismiss, and the Department of Children and Families reversed its finding of neglect. The arbitrator also found that "there are significant parts of [the wife's] story that she related to the investigating officer that were not corroborated by, and [were] seemingly contradicted by, other evidence in the record."

For instance, the arbitrator found that the wife's claim that the grievant bound her wrists and taped her mouth with duct tape was contradicted by the DNA tests on the two pieces of duct tape that were found at the scene, one of which contained only the wife's DNA, and the grievant's DNA was eliminated from that piece. The arbitrator also found that the wife's statement, made during both her 911 call and her testimony at the hearing on the protective order, that the grievant was " 'drunk' " was contradicted by the result of his breath test at the hospital, which had a reading of 0.0 percent blood alcohol content, and that there was nothing in the recording of the call between the grievant and the dispatcher

that indicated that the grievant was inebriated. The arbitrator further found that the wife's statement, made during her testimony at the hearing on the protective order, that she vomited on the floor of the basement as a result of being gagged was not supported by other evidence. In support of this finding, the arbitrator noted that there was no mention of her vomiting in the police incident report, and, more specifically, Officer Parker made no mention in his report of discovering any vomit or vomit residue on the floor of the basement.

In contrast, the arbitrator found that the grievant's testimony was credible and corroborated by other evidence in the record, including records of his phone calls to the police on the night of the incident. In particular, the arbitrator also found that, "[a]s for [the grievant's] reluctance to leave the home, [the grievant] credibly testified that he felt [that] his life was in danger, and [he] was unwilling to exit until he felt confident about his safety. He was not contacted by [Officer Manson] to discuss his removal until 1:38 a.m." Moreover, the arbitrator found that "[t]he union presented a number of witnesses who testified on the grievant's behalf. . . . All of these witnesses testified that they [had] the highest regard for the grievant's integrity [and] professionalism, and those individuals employed by the university commented on his dedication and commitment to the university."

The arbitrator explained: "[I]n situations [in which] an employee has been charged with a crime and arrested, but there has not been a court determination [as to whether the employee is guilty or not guilty], arbitrators generally have held that the fact that an employee has been arrested is not sufficient, standing alone, to justify discharge. . . . Put another way, in a situation [in which] an employee has been charged with criminal conduct that impacts his ability to perform his job duties, an employer may decide to discharge an employee immedi-

ately or may suspend him pending the outcome of the criminal case. If the employer decides to terminate an employee without waiting for the criminal charges to be resolved, it must produce convincing evidence that the charges made against the employee are valid. In this case, the investigation conducted by the university failed to prove by convincing evidence that the charges were substantial and well-founded." (Citation omitted.) The arbitrator also found that, "[w]ith regard to the negative publicity, which generated four requests by former students to have the grievant's initial decision[s] [on their own student conduct cases] reviewed, the university found no basis for overturning those decisions. More importantly, negative publicity generated by unproven allegations does not typically establish the appropriate nexus between the grievant's job duties and his off-duty conduct."

The arbitrator ultimately concluded that "the [university's] investigation failed to [establish], by clear and convincing evidence, that the grievant was guilty as charged. For this reason, I return the grievant to his position [as] director of student conduct, remove the penalty from his personnel file and require the university to make the grievant whole."

Thereafter, the state filed an application to vacate the arbitration award, and the union filed a motion to confirm that award. See General Statutes §§ 52-417 and 52-418. In its application to vacate, the state contended that the award violated public policy. Specifically, the state claimed, inter alia, that the grievant's reinstatement "violate[d] [the] public trust because his actions, for which he was terminated, have a direct nexus with his responsibilities as director of student conduct and will have a detrimental effect on his necessary working relationships with students and [law] enforcement, among others." The trial court granted the state's application

to vacate the award and denied the union's motion to confirm the award. This appeal followed.[5]

## I

## STANDARD OF REVIEW AND PUBLIC POLICY ANALYSIS

We begin with the well established standard of review. "Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . Furthermore, in applying this general rule of deference to an arbitrator's award, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the [arbitrator's] acts and proceedings. . . .

"We have recognized, however, that an arbitration award should be vacated when, inter alia, it violates clear public policy. . . . When a challenge to a consensual arbitration award raises a legitimate and colorable claim of violation of public policy, the question of whether the award violates public policy requires de novo judicial review." (Citations omitted; internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, 322 Conn. 713, 721, 142 A.3d 1122 (2016).

"We emphasize, however, that our de novo review is limited to the question of whether the arbitrator's [award] is itself contrary to an established public policy. In a case involving an unrestricted submission, when we conduct de novo review in response to a claim of a public policy violation, we do not review either the arbitrator's construction of the agreement, to determine whether that

[5] The union appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

construction is correct, or the arbitrator's factual findings, to determine whether those findings have sufficient evidentiary support." (Emphasis omitted.) Id., 721 n.8. In reviewing a claim that an award rendered in a consensual arbitration violates this state's public policy, we are bound by the arbitrator's factual findings. Id.

"The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy. . . . A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . .

"The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . [G]iven the narrow scope of the public policy limitation on arbitral authority, the trial court's order vacating the arbitrator's award should be upheld only if the plaintiff demonstrates that the . . . award clearly violate[d] an established public policy mandate. . . . As we repeatedly have emphasized, implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule." (Citations omitted; internal quotation marks omitted.) Id., 722.

In considering a claim that considerations of public policy make the arbitration award unenforceable, the United States Supreme Court has explained that "we must assume that the [collective bargaining] agreement itself calls for [the grievant's] reinstatement. That is

because both [the] employer and [the] union have granted to the arbitrator the authority to interpret the meaning of their contract's language, including such words as 'just cause.' . . . They have 'bargained for' the 'arbitrator's construction' of their agreement. . . . And courts will set aside the arbitrator's interpretation of what [the] agreement means only in rare instances." (Citations omitted.) *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17,* 531 U.S. 57, 61–62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000). "[A]s long as [an honest] arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." (Internal quotation marks omitted.) Id., 62.

As the United States Supreme Court has explained: "[T]he question to be answered is not whether [the employee's behavior] itself violates public policy, but whether the agreement to reinstate him does so. To put the question more specifically, does a contractual agreement to reinstate [the employee] . . . run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?" (Citation omitted.) Id., 62–63. We acknowledge that, "in principle . . . courts' authority to invoke the public policy exception is not limited solely to instances [in which] the arbitration award itself violates positive law. Nevertheless, the public policy exception is narrow . . . ."[6] Id., 63. We are also mindful that,

---

[6] We agree with the United States Court of Appeals for the Third Circuit that, although statutes, regulations, and administrative decisions are examples of positive law, "[i]t seems reasonable that the contours of positive law are broad enough to include not just specific rules or prohibitions but also the stated purposes behind these rules or prohibitions. [When] the 'positive law' is a stated purpose behind a statute or regulation, to thwart the purpose is to 'violate positive law.' " *Exxon Shipping Co.* v. *Exxon Seamen's Union,* 993 F.2d 357, 364 (3d Cir. 1993).

particularly when the legislature has already spoken, "courts should approach with particular caution pleas to divine further public policy in that area." Id.

Consistent with the foregoing law, the sole issue before us is whether public policy is violated by the arbitration award reinstating the grievant to employment after a court had dismissed his criminal charges stemming from off-duty conduct and he had successfully completed a six month therapeutic domestic violence offender program. This court employs a two-pronged analysis to determine whether an arbitration award should be vacated for violating public policy. "First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy." (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 723.

We assume, for the purposes of this appeal, that the arbitration award reinstating the grievant implicates the explicit, well-defined and dominant public policies of protecting victims of domestic violence, including authorizing protective orders; see General Statutes (Supp. 2018) § 46b-15;[7] protecting children; see, e.g., General Statutes (Supp. 2018) § 17a-101 (a); and preventing interference with or endangering the police. See, e.g., General Statutes (Rev. to 2017) § 53a-167a (a).[8]

We turn next to the question of whether, under the facts and circumstances of this case, the arbitration award reinstating the grievant violated these public policies. "In making this determination, we are mindful that the fact that an employee's misconduct implicates public

[7] Hereinafter, all references to § 46b-15 are to the version of that statute in the 2018 supplement of the statute.

[8] Hereinafter, all references to § 53a-167a are to the 2017 revision of the statute.

policy does not require the arbitrator to defer to the employer's chosen form of discipline for such misconduct. As the United States Supreme Court has held, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. . . . [Thus, the] arbitrator has the authority to choose the appropriate form of discipline even when the employee misconduct implicates public policy. . . . The party seeking to vacate an award reinstating a terminated employee bears the burden of proving that nothing less than . . . termination of . . . employment will suffice given the public policy at issue." (Citations omitted; internal quotation marks omitted.) *New Haven* v. *AFSCME, Council 4, Local 3144*, 338 Conn. 154, 173–74, 257 A.3d 947 (2021); see also *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 739 (emphasizing that "public policy based, judicial second-guessing of arbitral awards reinstating employees is very uncommon and is reserved for extraordinary circumstances").

A

*Burr Road* Factors

The seminal case in this area is *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 114 A.3d 144 (2015) (*Burr Road*). In that case, we clarified the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy. See *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 725–26. We explained in *Burr Road* that a reviewing court's analysis should focus on four principal factors: "(1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether

the grievant is incorrigible.'"[9] *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 634. We made clear in *Burr Road* that, to the extent that the arbitrator did not make findings on the factors, "we are not free to supplement the record with factual findings of our own. . . . Consequently, our discussion of the *Burr Road* factors, in places, necessarily will be limited." (Citation omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 726 n.12.

1

### Statutes, Regulations and Other Embodiments of Public Policy

"The first [*Burr Road*] factor requires us to consider whether the relevant statutes, regulations, and other manifestations of the public policy at issue themselves recommend or require termination of employment as the sole acceptable remedy for a violation thereof. . . . Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. . . . Whether sources of public policy themselves mandate termination is a question of law subject to plenary review." (Citations omitted.) *Burr Road Operating Co.*

---

[9] In *Burr Road*, we noted that consensus on whether an arbitral award violates public policy "has proved elusive." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 633. "[T]o assure consistent, principled decision making in cases of this nature," we "clarif[ied] the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy . . . ." Id. Although *Burr Road* did not purport to overrule any of our existing case law holding that reinstatement of a terminated employee violated a clear public policy, the factors enumerated therein were intended to ensure that the public policy exception is construed "stringent[ly] and narrow[ly]," with "deference to arbitrators' determinations . . . ." (Internal quotation marks omitted.) Id., 631–32.

*II, LLC* v. *New England Health Care Employees Union, District 1199,* supra, 316 Conn. 634–35.

In the present case, the state does not point to, and we cannot find, any statute, regulation, or case law that mandates the termination of the grievant's employment. Indeed, although § 53a-167a (a) manifests a public policy against interfering with a police officer in the performance of his or her duties, it does not recommend or require termination of employment of an individual charged with a violation of it. Similarly, although § 46b-15 manifests a public policy of protecting victims of domestic violence and is a very important tool to accomplish that purpose, there is nothing in that statute that recommends or mandates the termination of employment of an individual who is subject to a protective order.

Without any statute or regulation requiring or recommending the termination of the grievant's employment, the state instead points to the university's code of conduct for employees. The code of conduct provided that "[a]ll members of the [Connecticut State Colleges and Universities] community have a duty to conduct themselves with integrity, to act with the highest ethical and professional standards, to exercise responsible judgment, and to demonstrate accountability and compliance with state and federal law, [Board of Regents for Higher Education] policies and procedures, and collective bargaining agreements." The university's code of conduct did not, however, specify that termination was the sole remedy for a violation thereof.

In fact, the collective bargaining agreement between the parties explained that "the [university] subscribes to the principles of progressive discipline." The collective bargaining agreement further specified that "[d]iscipline of a member [of the union] may include any written reprimand, demotion, suspension with or without

pay, or dismissal from service." Therefore, even if we were to agree that the grievant's behavior violated the university's code of conduct, that code of conduct did not require or recommend the termination of the grievant's employment. Instead, the collective bargaining agreement expressly provided for progressive discipline.

We have declined on multiple occasions to vacate an arbitration award on the ground that it violated public policy when the employer could not point to an explicit, well-defined public policy that mandated termination. See, e.g., *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 157, 178–79 (declining to vacate arbitration award reinstating employee when "[t]he city has identified no provision of [the parties' collective bargaining] agreement or an employee regulation or ordinance that requires termination of employment for employees who disregard the advice of the corporation counsel's office"); *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 715–16, 726–28 (public policy did not mandate termination of employment of state employee who had been caught smoking marijuana at work because relevant state regulations and drug-free workplace policy provided that state employees may be disciplined short of termination of employment for use of illegal drugs while on duty); *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 130–31, 136–37, 139–40, 142, 855 A.2d 964 (2004) (public policy did not mandate termination of employment of state employee who deliberately shoved disabled client into chair, causing him to sustain injury); see also, e.g., *Boston Medical Center* v. *Service Employees International Union, Local 285*, 260 F.3d 16, 25–27 (1st Cir. 2001) (holding that termination of employment of negligent nurse was not required by public policy when Massachusetts laws and regulations did "not establish a public policy prohibiting [the employee's] reinstatement" and there was "no specific

provision of Massachusetts law that would [have been] violated by the arbitrator's order to reinstate [the employee]"), cert. denied, 534 U.S. 1083, 122 S. Ct. 816, 151 L. Ed. 2d 700 (2002); *Saint Mary Home, Inc.* v. *Service Employees International Union, District 1199*, 116 F.3d 41, 46 (2d Cir. 1997) ("[n]owhere does the [employer] point to an established policy that calls for a fixed disciplinary action of permanent dismissal in all cases [in which] drug related conduct occurs in the workplace").

A decision of the Alaska Supreme Court illustrates the reasoning underlying these cases. In *State* v. *Public Safety Employees Assn.*, 323 P.3d 670 (Alaska 2014), the court considered whether implementation of an award violated public policy when the source of the public policy did not compel termination. See id., 672. In that case, the award reinstated a state trooper whose employment was terminated for having consensual sex with a domestic violence victim the morning after assisting in the arrest of the victim's husband. See id. The court explained that "the relevant inquiry is not whether the [grievant's] conduct violated public policy but rather whether the arbitrator's award violates an explicit, well-defined, and dominant public policy. The public policies cited by the [s]tate [of Alaska] do not compel termination. And the [s]tate has not directed us to any public policy that would have compelled the termination of a trooper for the misconduct at issue at the time of the arbitration. Indeed, the [s]tate clearly had the authority . . . to use progressive discipline rather than to discharge the [grievant]. No statute or internal regulation prohibited the use of progressive discipline in this case. Because the collective bargaining agreement provided for binding arbitration, the arbitrator also had the authority to impose progressive discipline. The arbitrator's order of reinstatement after suspension, therefore,

cannot be characterized as a violation of public policy.'' (Footnotes omitted.) Id., 679.

We note that none of our case law should be understood to mean that the first *Burr Road* factor, standing alone, is dispositive of the public policy analysis. Numerous Connecticut cases demonstrate that an arbitration award involving employee discipline for conduct that occurred while on duty may be vacated under the public policy exception even when statutes, regulations, or other provisions of positive law do not mandate a specific outcome, such as termination of employment. See, e.g., *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 521–22, 535, 538–39, 69 A.3d 927 (2013) (holding that public policy was violated when arbitrator ordered reinstatement of correction officer with lengthy history of workplace sexual harassment, despite absence of positive law mandating termination); *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 36, 46–48, 757 A.2d 501 (2000) (holding that public policy was violated when arbitrator ordered reinstatement of town employee who had embezzled town funds, despite absence of any positive law mandating termination); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 468–69, 476–78, 747 A.2d 480 (2000) (holding that public policy was violated when arbitrator ordered reinstatement of correction officer who committed harassment in second degree by placing racist and profane call to state legislator, despite absence of positive law mandating termination).

We recognize in the present case the strong public policies against domestic violence and in support of cooperation with the police and child safety. But those strong public policies do not provide explicit support for the narrower public policy that the state seeks to invoke here: a policy against reinstatement of a long-term employee with no disciplinary history following off-duty conduct leading to an arrest and charges that

have been dismissed.[10] The state does not point to an established policy that calls for a fixed disciplinary action of permanent dismissal in all cases in which an employee in the grievant's position is arrested for off-duty conduct. This court has long recognized that "the fact that there is a strong public policy against certain misconduct does not require an employer to terminate every employee who engages in that misconduct." *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 534.

To repeat, whether the grievant's conduct violates a strong public policy is a different question from the one we must answer. The issue before us is whether the arbitrator's decision violates public policy, and the first *Burr Road* factor specifically requires us to determine, on the facts found by the arbitrator, only whether any explicit public policy *prohibits his reinstatement*. None has been identified here. Therefore, this factor plainly weighs in favor of the union.

### 2

### Public Trust

The second *Burr Road* factor "is whether the nature of the employment at issue implicates public safety or

---

[10] Given that the legislature has enacted the family violence education program; see General Statutes § 46b-38c (h) (1); which allows an individual charged with domestic violence to have his or her charges dismissed upon the completion of, inter alia, family violence education classes and a period of supervision with no further charges of domestic violence; see General Statutes § 46b-38c (h) (2); we are reluctant to conclude that the public policy of this state would bar the reinstatement of an employee who has completed a six month therapeutic domestic violence offender program after his arrest and whose charges were dismissed. To be sure, as reflected in § 46b-38c (h) (1) through (3), it is also the policy of this state to get alleged offenders the help they need and, if they are compliant, to dismiss and erase all of their family violence charges.

Even though the grievant was not charged with interfering with an officer for refusing to immediately comply with police instructions or for the approximately three hour standoff, that charge is of the type that would also be subject to dismissal in our state pursuant to a diversionary program. See General Statutes (Rev. to 2017) § 54-56e (a), (c) and (f); see also *State* v. *Kevalis*, 313 Conn. 590, 592, 99 A.3d 196 (2014) (accelerated rehabilitation program was applicable to charge of interfering with officer).

the public trust." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 635. The second *Burr Road* factor "hinges on general questions of law and policy and is, therefore, subject to plenary judicial review." Id., 637.

The state asserts that the grievant occupies a position of public trust. The state also asserts that this factor necessitates the termination of his employment because the grievant's actions conflict with the university's mission, goals, policies, or regulations, and that there is a nexus between his actions on the night of the incident and the judgment that he must exercise in his role as the director of student conduct for the university. The state further asserts that the grievant's credibility with students and parents has been impaired by his actions.

Although we agree with the state that the grievant occupies a position of public trust, the mere fact that an employee holds a position that implicates public safety or the public trust does not, in and of itself, mandate that termination of employment is the only acceptable action when such an employee engages in conduct that is objectionable to the employer. See, e.g., *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 157, 167, 180 (declining to vacate arbitration award reinstating city employee to her position as executive director of city's Commission on Equal Opportunities and awarding her back pay even though she held position that arguably implicated public trust). Indeed, the undisputed evidence before the arbitrator in the present case was that multiple employees of the university who occupied positions of public trust had been arrested for off-duty conduct. The university's president was arrested for impersonating a police officer. One professor was arrested for public indecency. Another professor was arrested for harassment. The evidence before the arbitrator revealed that the university did

not discipline these employees for their arrests or any other members of the bargaining unit for off-duty conduct.

The university has failed to present any significant evidence demonstrating why the grievant's off-duty conduct so impaired the public trust that termination was required. For example, the university did not present any testimony from any students, faculty, staff, or members of the university community who would be unable or unwilling to work with the grievant or to cooperate with him in the execution of his duties. In the absence of any such evidence, we cannot conclude that the grievant's reinstatement to his position as director of student conduct will impair the public trust. Accordingly, we conclude that this factor is neutral.

### 3

### Egregiousness

The third *Burr Road* factor is "the relative egregiousness of the grievant's offense. . . . This factor encompasses myriad considerations, including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the [grievant] is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue. . . .

"This factor presents a mixed question of law and fact. We take as our starting point the factual findings of the arbitrator, which are not subject to judicial review. . . . We defer as well to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue." (Citations omitted; internal quotation marks omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 637–38.

"[F]or purposes of the public policy analysis, [however] our determination of whether the conduct in question was so egregious that any punishment short of termination would offend public policy is not restricted to those findings, [as] they may be [case-specific]. . . . Judicial review . . . necessarily transcends the interests of the parties to the contract . . . and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee, and therefore requires a broader scope. . . . Accordingly, we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." (Citations omitted; internal quotation marks omitted.) S*tate* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 734.

In considering whether the egregiousness of the grievant's behavior requires termination of his employment, we are bound by the factual findings of the arbitrator, which are not subject to judicial review. The arbitrator made a number of factual findings relevant to our resolution of this issue that we cannot evade.

a

Domestic Violence Related Charges

The arbitrator found that "there [was] compelling evidence that calls into question the narrative as reported

by the incident report and [the wife's] testimony before the court in the protective order proceeding." The arbitrator further found that "the criminal charges, which were by all accounts . . . very serious, including strangulation and kidnapping, were all dismissed. The grievant testified that he was offered a plea deal on reduced charges, which he rejected because he had done nothing wrong. The university suggested, by eliciting testimony from [the wife], that the charges were dropped at her request because she did not wish to have her children visit their father in jail. However, there is no evidence that the prosecutor decided to drop the charges based on [the wife's] request. Rather, the court's record of the case reveals that the presiding judge granted the [grievant's] oral motion to dismiss."

The grievant was not convicted of the offenses for which he was arrested, and the arbitrator in the present case did not credit the allegations of domestic abuse. We are bound by the arbitrator's factual findings.

b

Actions Related to the Protection of Children

The arbitrator found that "the children were asleep and undisturbed during the entire incident, and the grievant repeatedly told the police that he would not harm his children . . . ." The arbitrator also found that "the findings by the [Department of Children and Families] investigators that [the grievant] had physically neglected his children have been reversed on appeal as unsubstantiated." In other words, the department found no reasonable basis to believe that any neglect of the children occurred.

c

Actions Related to the Interference with Police Officers

The arbitrator found that "[the grievant] called the Hartford Police Department within [ten] minutes after

his conversation with Officer Parker. . . . He testified that he had ten phone conversations with the police [on the night in question] and presented a copy of his phone records to corroborate his testimony. . . . He stated that he repeatedly told the police that 'I will not harm any law enforcement; I will not harm my children.' He testified that he made these statements because, as a large, Black man, he needed to establish communication with the police in order for them to determine that he was not a threat. . . . He further testified that he was told by the police at 12:31 a.m. to 'sit tight,' 'someone is coming to talk to you.' . . . That individual, [Officer Manson], did not . . . contact . . . [the grievant] until 1:38 a.m. . . . [The grievant] testified that his reluctance to leave his home was because he was trying to preserve his life. He claimed he was 'scared to death.' " (Citations omitted.)

Indeed, the arbitrator found that "the grievant repeatedly told the police that he would not harm . . . law enforcement. As for his reluctance to leave the home, [the grievant] credibly testified that he felt [that] his life was in danger and [that he] was unwilling to exit until he felt confident about his safety. He was not contacted by [Officer Manson] to discuss his removal until 1:38 a.m."

Thus, the arbitrator found that the domestic violence charges were not proven, the Department of Children and Families found no reasonable basis to believe that the children were neglected insofar as the charges related to child neglect were all unsubstantiated, and the grievant's reluctance to immediately comply with police instructions was due to his reasonable fear for his safety. On the basis of these factual findings by the arbitrator, which are not subject to judicial review, we cannot conclude that the harms imposed and risks created by the grievant's conduct were so severe as to require the termination of his employment.

We also must consider the intent of the grievant with respect to the offending conduct and the public policy at issue. As we explained in *Burr Road*, consideration of "the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue" is appropriate. *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 638; see also id., 646–47 (relying on arbitrator's findings of mitigating factors and other findings that could have been mitigating to support conclusion that grievant's conduct was not so egregious as to require termination).

We wish to be clear that we do not condone the grievant's response to the police presence outside of his home. Rather than promptly and peaceably submit, as required by law, he declined to exit his home for questioning or arrest by the police officers for a lengthy period of time. The police considered the situation to present risks sufficiently dangerous to require emergency evacuation of the surrounding area.

The question, however, is not whether the grievant engaged in misconduct, but whether, on the facts as found by the arbitrator, termination of the grievant's employment was required as a matter of public policy. Our review of the arbitrator's findings demonstrates that he clearly took into account circumstances that mitigated the grievant's refusal to leave his home when the police arrived. The arbitrator credited the grievant's testimony about the recent killings of Black men and his resultant fear for his safety, and that, in light of those concerns, the grievant responded to the police presence by initiating contact with the police to show that he was not a threat, rather than immediately walking out of his home or letting the officers in. In light of the arbitrator's findings, we will not deem the grievant's conduct inexcusably egregious because such a characterization fails to fully appreciate a reality that this court

previously has recognized—namely, that some citizens, particularly minorities, are fearful that contact with the police can be dangerous.

Indeed, this court has expressly stated that, "[a]mong some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. . . . [T]he evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient." (Internal quotation marks omitted.) *State* v. *Edmonds*, 323 Conn. 34, 74, 145 A.3d 861 (2016), quoting *Illinois* v. *Wardlow*, 528 U.S. 119, 132–34, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (Stevens, J., concurring in part and dissenting in part). Our review of the arbitrator's decision in this case demonstrates that the arbitrator considered the grievant's fears related to the police presence credible and concluded that those fears mitigated the grievant's failure to immediately comply with police instructions during the incident.

We also consider it significant that the grievant was not charged with, let alone convicted of, any crime related to his interaction with the police on the night of the incident. It is difficult for us to see how any reviewing court could conclude that the grievant's conduct was so egregious as to require the termination of his employment to vindicate the public policy against interfering with a police officer when the police officers on the scene that night—despite having charged the grievant with several crimes spanning from kidnapping to breach of the peace—did not charge him with that crime or any other crime relating to his interaction with the police.

Furthermore, not only did the grievant contact the police shortly after they arrived, but he was told at 12:31 a.m. that an officer would contact him to negotiate his surrender. That officer did not contact the grievant until more than one hour later. When he was finally able to speak with Officer Manson and was assured that he could leave his home safely, the grievant ultimately complied with the police officers' instructions, was taken into custody, and was not charged with any crimes related to his interactions with the police. Cf. *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 478 (upholding trial court's vacatur of arbitration award reinstating employee charged with violation of criminal statute on ground that "[the] award violated a clearly defined public policy because [it] reinstated a state employee whose conduct blatantly violated both a criminal statute and the employment regulations set forth by the [D]epartment of [C]orrection").[11] Therefore, assessing this situation in context on the basis of the facts found by the arbitrator, we cannot conclude that the grievant's conduct, when viewed as a whole and in light of the mitigating factors found by the arbitrator, was so severe as to require the termination of his employment.

We now turn to whether reinstating the grievant would send an unacceptable message to the public or to other university employees regarding the conduct in question and the potential impact of the grievant's conduct on students and other nonparties to the employment contract. In this regard, the state asserts that reinstatement of the grievant to his position as the uni-

---

[11] Although we note that criminal charges are not necessarily a prerequisite to a conclusion that an employee's actions are so egregious as to require the termination of his employment, they are a relevant consideration. See, e.g., *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 647 (noting that "the conduct itself was not criminal in nature" and concluding that behavior was not egregious).

versity's director of student conduct after this incident would send an unacceptable message to the other employees of the university and the students and that his conduct had undermined his credibility with law enforcement.

The arbitrator explicitly rejected the university's claim that the grievant's credibility with law enforcement had been seriously undermined as a result of his conduct. The only evidence that the university introduced to demonstrate that this incident had any impact on its students was that four former students had asked to have their initial disciplinary decisions by the grievant overturned. The arbitrator noted that, "[a]ccording to the grievant, he [had] handled thousands of student conduct cases over the years, totaling in the neighborhood of 15,000." The arbitrator found that "[t]he university reviewed these four cases and determined that the issues raised by the [former] students [were] unfounded. In addition, the university undertook a review of a number of other cases that the grievant had adjudicated but found nothing improper regarding his determinations." The university presented no evidence to support its claim that there would be a negative impact on other employees.

The union, for its part, presented evidence that university employees would not be negatively impacted by the grievant's reinstatement. The arbitrator credited the testimony of the university's chief administrative officer and a sergeant with the university's police force that "the grievant's arrest would not impact his interaction with either law enforcement or the university community in any substantial way." Therefore, we conclude that the state failed to satisfy its burden of establishing that the potential impact on nonparties to the employment contract is so negative so as to require the termination of the grievant's employment.

We next consider whether the alleged misconduct occurred during the performance of the grievant's offi-

cial duties. As we discussed previously in this opinion, it is undisputed that the conduct at issue did not occur during the performance of the grievant's official duties. Instead, the conduct occurred at the grievant's home and involved a highly personal issue.

A review of the cases in which this court or the Appellate Court has vacated an arbitration award on the ground that it violated public policy reveals that, in the vast majority of cases, those courts have found awards to violate public policy when the employee's behavior involved a violation of an established law or policy that occurred during the performance of the employee's duties.[12] See, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 36–37 (upholding trial court's vacatur of arbitration award reinstating employee who embezzled from former employer because award violated public policy); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 469, 476–78 (concluding that arbitration award reinstating correction officer who made harassing, racist phone calls to state legislator while on duty violated public policy because correction officer's conduct violated criminal statute and employment regulations of Department of Correction); *South Windsor* v. *South Windsor Police Union, Local 1480, Council 15, AFSCME, AFL-CIO*, 41 Conn. App. 649, 654, 677 A.2d 464 (concluding that arbitration award reinstating police officer who deliber-

[12] The dissent relies on *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000), for the proposition that off-duty conduct can form the basis for vacating an award for a violation of public policy. See id., 802–803. That case is readily distinguishable from the present case because the employee's off-duty conduct resulted in a conviction; see id., 795, 800–801, 803; and because the Appellate Court in that case pointed to certain regulations that embodied Connecticut's clear policy attaching high priority to the safe transportation of children by requiring, among other things, an annual review of bus drivers' criminal convictions. See id., 803–804 n.5. No equivalent regulations exist in this case with respect to the grievant's job position.

ately revealed identity of confidential informant violated public policy), cert. denied, 239 Conn. 926, 683 A.2d 22 (1996); *State* v. *Council 4, AFSCME*, 27 Conn. App. 635, 641–42, 608 A.2d 718 (1992) (upholding trial court's vacatur of arbitration award reinstating employee who misappropriated state funds because award violated public policy).[13]

In sum, we conclude that the factual findings of the arbitrator do not compel us to conclude that the grievant's off-duty conduct was so egregious that public policy requires the termination of his employment.

### 4

### Incorrigibility

"The fourth *Burr Road* factor is whether the grievant is so incorrigible as to require [the] termination [of his employment]. . . . Put differently, in light of the grievant's full employment history, is there a substantial risk that, should a court uphold the arbitration award of

---

[13] Although we do not suggest that reinstatement of an employee for off-duty conduct could never amount to a violation of public policy, courts have often distinguished between "disfavored conduct, in the abstract," and "disfavored conduct [that] is integral to the performance of employment duties." (Emphasis omitted.) *Delta Air Lines, Inc.* v. *Air Line Pilots Assn., International*, 861 F.2d 665, 671 (11th Cir. 1988), cert. denied, 493 U.S. 871, 110 S. Ct. 201, 107 L. Ed. 2d 154 (1989). Courts have also distinguished between off-duty conduct and on-duty conduct when examining an arbitration award requiring reinstatement of an employee. See, e.g., *Wilmington* v. *American Federation of State, County & Municipal Employees, Council 81, Local 1102*, Docket No. Civ. A. 19561-NC, 2003 WL 1530503, *1, *5 (Del. Ch. March 21, 2003) (declining to vacate arbitration award as violation of public policy when award required reinstatement of city employee who, while off duty, used pepper spray and was alleged to have kicked person being apprehended by police); *Southwest Ohio Regional Transit Authority* v. *Amalgamated Transit Union, Local 627*, 131 Ohio App. 3d 751, 757–58, 764–65, 723 N.E.2d 645 (1998) (declining to vacate arbitration award as violation of public policy when award required reinstatement of transit authority worker who tested positive for marijuana during physical examination on off-duty day), appeal denied, 85 Ohio St. 3d 1480, 709 N.E.2d 851 (1999).

reinstatement, this particular employee will reengage in the offending conduct? . . . Here, relevant considerations include whether, on the one hand, the grievant has committed similar offenses in the past and has disregarded an employer's prior warnings or clear policy statements; or, on the other hand, whether the grievant: (1) has generally performed his work in a competent and professional manner; (2) has demonstrated a willingness to change and an amenability to discipline; (3) has exhibited remorse and attempted to make restitution for past offenses; and (4) is likely to benefit from additional training and guidance. . . . We also consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others. . . . Because these considerations are largely fact based and [case-specific], a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated. . . . [In the absence of] an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of recidivism is plain from the face of the record." (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent,* supra, 322 Conn. 736–37.

Here, the arbitrator did not make any finding indicating that the grievant was incorrigible; nor does anything in the record suggest that the grievant will likely recidivate. Rather, the record reveals the opposite. The incident involving the police appears to have been an isolated and idiosyncratic event, and the arbitrator heard the undisputed testimony of a licensed clinical social worker, a certified employee assistance professional, that the grievant had successfully completed a therapeutic domestic violence offender program after his arrest and had attended approximately 150 sessions. Accordingly, we cannot conclude that the grievant was

so incorrigible as to require the termination of his employment.

As we emphasized in *Connecticut Employees Union Independent*, "public policy based, judicial second-guessing of arbitral awards reinstating employees is very uncommon and is reserved for extraordinary circumstances . . . . Our general deference to an experienced arbitrator's determinations regarding just cause and the appropriate remedy is vital to preserve the effectiveness of an important and efficient forum for the resolution of employment disputes. If an employer wishes to preserve the right to discharge employees guilty of misconduct . . . thereby removing the matter from an arbitrator's purview, it remains free to negotiate for the inclusion of an appropriate provision in the collective bargaining agreement that would achieve that result." Id., 739–40. We conclude that the state failed to demonstrate that an application of the *Burr Road* factors establishes that reinstatement of the grievant violates public policy.[14]

## II

## THE DISSENT

### A

### Standard

The dissent's entire position rests on its disagreement with the remedy chosen by the arbitrator. The dissent

---

[14] We recognize that, although a nonexclusive list of multiple factors, such as the *Burr Road* factors, is useful to ensure consistent and principled decision-making; see footnote 9 of this opinion; "a [too] heavy focus on enumerated factors, or comparisons to other precedents, may eclipse the ultimate inquiry before the court, which is [case-specific] . . . ." (Internal quotation marks omitted.) *State* v. *Castillo*, 329 Conn. 311, 341, 186 A.3d 672 (2018) (*D'Auria, J.*, dissenting). Our focus on the *Burr Road* factors has not eclipsed the ultimate inquiry but, instead, has focused our attention on the question before us—whether the arbitration award reinstating the grievant's employment violates the public policy of this state.

asserts that "[the] reinstatement of the grievant without so much as a letter of reprimand or warning in his personnel file" violates public policy. The principal problem with that position is that it is premised on the fact that the grievant engaged in misconduct on the night in question consistent with the version of events told by his wife. However, the arbitrator did not find the testimony of the wife to be entirely credible, concluding that it was contradicted by compelling evidence. Essentially, the arbitrator evaluated all of the circumstances and determined, after hearing evidence from both parties, that the domestic dispute revolved around a credibility contest wherein, on balance, he believed the grievant's version of events. And, with respect to the approximately "three hour armed standoff," the arbitrator concluded that there were circumstances that mitigated the grievant's conduct. There is no claim here that the arbitrator acted outside of the scope of his authority in making his decision. Consequently, as the United States Supreme Court has stated, "the fact that a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision." (Internal quotation marks omitted.) *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, supra, 531 U.S. 62. The United States Court of Appeals for the Eleventh Circuit has put the point more bluntly: "An arbitrator's [decision] may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference." *Delta Air Lines, Inc.* v. *Air Line Pilots Assn., International*, 861 F.2d 665, 670 (11th Cir. 1988), cert. denied, 493 U.S. 871, 110 S. Ct. 201, 107 L. Ed. 2d 154 (1989). Thus, even if we were to conclude that the arbitrator's determination on the basis of the evidence is incorrect, or even unreasonable, that is simply not a basis to overturn his award.

The dissent also asserts that "the arbitration award in the present case is unprecedented in this state and

in virtually every other jurisdiction by virtue of its failure to impose any sanction for conduct demonstrably at odds with the public policies at issue, the employee's job duties, and the employer's mission, regulations, and goals." We do not disagree that the arbitration award reinstating the grievant with full restoration of benefits reflects a permissive attitude toward the grievant's misconduct. But, again, our role is not to adjust the award to a disciplinary midpoint that conforms to our own standards of appropriate severity. We also observe, in this regard, that the state has taken an all-or-nothing approach on appeal, as the university did when seeking to terminate the grievant's employment and at the arbitration hearing, arguing that termination of the grievant's employment is mandated by the public policy of this state and that no lesser sanction will suffice. On this record, and in light of the way this case has been briefed and argued by the parties, we perceive no error.

Certainly, regardless of whether the arbitration award included some form of discipline, our review remains the same: we must determine whether the award violates an explicit, well-defined public policy. The United States Court of Appeals for the First Circuit has explained this point perfectly: "In the context of an arbitration award that reinstates a fired employee, the question is not whether the charged conduct offends public policy or whether some remedy short of unconditional reinstatement (say, a probationary period or a suspension without pay) might have been preferable. Rather, the sole question is whether the award itself—the order for reinstatement—gives offense." *Mercy Hospital, Inc.* v. *Massachusetts Nurses Assn.*, 429 F.3d 338, 343 (1st Cir. 2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1939, 164 L. Ed. 2d 663 (2006).

The dissent also asserts that "[i]t is well established that, when an arbitration award reinstating an employee is challenged as violative of public policy, the court

must determine 'whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue.' *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199,* [supra, 316 Conn. 639] . . . ." (Citation omitted; footnote omitted.) Although we acknowledge that this court included that language in *Burr Road,* we disagree that it was meant to expand the scope of the public policy exception or to establish a different standard.

Indeed, in *Burr Road* itself, we also reiterated the preexisting standard that "a party seeking to vacate an arbitration award reinstating a terminated employee [on the ground that termination of employment is required as a matter of public policy] bears the burden of proving that illegality or conflict with public policy is clearly demonstrated . . . and that nothing less than the termination of [the grievant's] employment will suffice to vindicate the public policy at issue." (Citation omitted; internal quotation marks omitted.) Id., 631. Then, more recently, we reaffirmed that the appropriate question in such circumstances is whether "nothing less than the termination of [the grievant's] employment will suffice given the public policy at issue." (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent,* supra, 322 Conn. 725; see also *New Haven* v. *AFSCME, Council 4, Local 3144,* supra, 338 Conn. 174 ("[t]he party seeking to vacate an award reinstating a terminated employee bears the burden of proving that nothing less than . . . termination of . . . employment will suffice given the public policy at issue" (internal quotation marks omitted)).

Accordingly, it is clear that the standard remains that a party seeking to vacate an arbitration award reinstating a terminated employee must demonstrate that implementation of the award (here, reinstatement with full restoration of benefits) would violate a specific and well-defined public policy. Although this is a stringent

standard, there are examples of when public policy requires vacatur of an award. See, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 36–37; *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 469, 476–78. On the basis of the facts found by the arbitrator, we cannot agree with the dissent that the arbitration award requiring the grievant's reinstatement violates public policy.

B

De Novo Standard of Review

The dissent misapplies the de novo review afforded a claim that implementation of an arbitration award violates public policy. Contrary to the dissent's position, since *Burr Road*, this court has clarified that "our de novo review is limited to the question of whether the arbitrator's decision [regarding the discipline or reinstatement of the grievant] is itself contrary to an established public policy. In a case involving an unrestricted submission, when we conduct de novo review in response to a claim of a public policy violation, we do not review either the arbitrator's construction of the agreement, to determine whether that construction is correct, or the arbitrator's factual findings, to determine whether those findings have sufficient evidentiary support." (Emphasis omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 721 n.8. Moreover, this court has also explained that, in conducting the de novo review, we are *not* permitted to make factual findings of our own on the *Burr Road* factors. See id., 726 n.12 (explaining that, "to the extent the arbitrator failed to make factual findings pertinent to the analysis in [*Burr Road*], we are not free to supplement the record with factual findings of our own"). Contrary to this well established law, the dissent maintains that it can engage in fact-finding and speculation regarding factors such as how other stakeholders may be impacted by the grievant's reinstatement. We disagree.

The law makes clear that, although we can review the facts found by the arbitrator and use those facts to make a de novo determination about the egregiousness factors, we cannot make factual findings, assess the credibility of witnesses, or engage in speculation when applying these factors. See, e.g., *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 44–45, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987) ("[T]he [reviewing court] . . . properly considered the established fact that traces of marijuana had been found in [an employee's] car. . . . [Nevertheless, to] conclude from the fact that marijuana had been found in [the employee's] car that [the employee] had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in [fact-finding] about [the employee's] use of drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award." (Citation omitted.)).

Notwithstanding this established law, the dissent makes factual findings that the arbitrator never made and draws inferences that run directly counter to the findings made by the arbitrator. Specifically, the dissent asserts that "[t]he severity of the risks created by the grievant's armed standoff with the police, which required the police to evacuate the grievant's street in the middle of the night, are equally self-evident, as is the message that his unconditional reinstatement sends to the community. As the trial court stated, the message it sends is 'that it is appropriate for a university administrator charged with the public trust of investigating and enforcing the code of student conduct to take the law into his own hands . . . to refuse to unload weapons, and [to] maintain a lengthy standoff with [the] police. The recipients of such a message would include students, parents, other staff, and the public.' " The dissent also asserts that "[t]he arbitrator further found that the

grievant refused to open his door, refused to unload his weapons, and repeatedly warned the police 'not [to] breach this house,' " and, "[g]iven these findings, as well as the grievant's statement that he was not ready to surrender, there can be no question but that the grievant intended to interfere with the police and to resist arrest."[15]

The dissent asserts that these points compel the necessary inference that reinstatement of the grievant would send an unacceptable message to the public and/or other stakeholders. As the United States Supreme Court has recognized, "it [is] inappropriate for [a reviewing court] itself to draw the necessary inference. . . . The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe [the grievant] and to be familiar with the [employer] and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them . . . ." *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, supra, 484 U.S. 44–45.

---

[15] The arbitrator did not find facts establishing that the grievant intended to interfere with the police or to resist arrest. The arbitrator explained that "[the grievant] testified that his reluctance to leave his home was because he was trying to preserve his life. He claimed he was 'scared to death' . . . and that Officer Parker's representation in his incident report that there was a loaded gun on the kitchen table was a 'lie.' He asserted that he had disassembled the firearm on the kitchen table and that [Officer] Manson knows that to be true. . . . This fact, among others, would have been revealed if the police had released the rest of the phone conversations that evening, as his attorney requested." (Citations omitted.) Although we agree that the grievant should have promptly and peaceably exited his home for questioning or arrest in a manner that would have allowed the police to determine that he was not a threat (and thus ensured his own safety), the specific question of the grievant's criminal intent was left unresolved by the arbitrator, and the factual record is sufficiently ambiguous to prevent us from reaching any definitive conclusion in that regard.

In addition to the fact that the dissent relies on facts not found by the arbitrator, it also does not consider the conflicting evidence. Although Suski-Lenczewski testified that four former students asked to have their own student conduct cases reviewed and that one parent did not want the grievant to have any further communication or interaction with the parent's daughter, the university did not present any witnesses to testify about the impact that the grievant's behavior had on them. On the other hand, the union presented the testimony of two former students and multiple university employees, who all testified after the incident in question about their favorable interactions with, and impressions of, the grievant. At best, there was conflicting testimony on this point.

The arbitrator considered this conflicting evidence, and, relying in part on the fact that the university found no basis for overturning any of the grievant's decisions and the fact that "negative publicity generated by unproven allegations does not typically establish the appropriate nexus between [a] grievant's job duties and his off-duty conduct," the arbitrator rejected the university's claim that this factor supported the university's decision to terminate the grievant's employment. Because the arbitrator made a factual finding that the negative publicity caused by the unproven allegations would not have a chilling effect on this issue, we are not free to make our own finding or to choose which testimony we find more credible.

Instead of relying on the factual findings of the arbitrator, as we must, the dissent makes numerous factual inferences and relies on speculation to reach its conclusion. For instance, the dissent asserts that "[t]he message that the . . . [arbitration] award sends to other employees occupying similar positions of trust, not to mention the nonparty stakeholders in this case—students, their parents, and the public at large—is simply

untenable." The dissent, however, is not able to point to any testimony or other evidence presented at the arbitration hearing or to factual findings of the arbitrator to support its conclusion that reinstatement of the grievant would have any negative effect on the students, parents, or other nonparty stakeholders in this case. Moreover, the dissent's position is contrary to findings that the arbitrator actually made, including his finding that the grievant's arrest "would not impact his interaction with either law enforcement or the university community in any substantial way." The university certainly could have presented such evidence at the arbitration, but it did not, and we cannot fill that evidentiary void for it.

## C

### Protective Order Hearing

The dissent asserts that "[a] trial court . . . found that [the grievant] posed a continuous threat of violence to [his wife] and, pursuant to . . . § 46b-15, issued a one year, full domestic violence order of protection against him." (Footnote omitted.) The dissent further relies on the transcript of that protective order hearing that was entered into evidence at the arbitration hearing. See footnote 10 of the dissenting opinion. We disagree with the dissent's reliance on the transcript of that protective order, rather than the facts as found by the arbitrator.

It is important to remember that the protective order was issued approximately two weeks after the incident, at a time when the grievant's criminal charges were still pending, and without any testimony from the grievant during the hearing. This timing reflects the expeditious treatment of protective orders under § 46b-15, which serves an incredibly important purpose in promoting the state's public policy of protecting victims of domestic violence. However, the issuance of a protective order

does not decide all further issues between the parties and certainly does not determine the appropriate employment related discipline under the collective bargaining agreement governing the present case. Indeed, if it were otherwise, courts may hesitate to issue a protective order in such an expedited fashion, a result we are loathe to encourage.

In the present case, the trial court that issued the protective order under § 46b-15 was not only doing so in an expedited manner but, unlike the arbitrator, did not hear any testimony from the grievant or have access to any of the other independent evidence presented by both parties at the arbitration hearing. The court was therefore in no position to make a credibility determination as to which story was more credible. The dissent has not cited to any legal principle that prohibited the arbitrator from making his own credibility determination after hearing all the evidence before him, some of which called into question the veracity of certain parts of the wife's rendition of the events. The arbitrator also was required to apply a higher standard of proof than that applied under § 46b-15. In short, the arbitrator was not bound by the findings of the trial court that issued the protective order, and the fact that the arbitrator's determinations varied from those of that court does not demonstrate that the arbitration award violates public policy.

We are acutely aware of the real and all too common risks of domestic violence and the importance of allowing courts to issue protective orders in an expedited fashion in an effort to provide relief for abuse victims. Bearing this in mind, however, we cannot conclude that the state has met its burden of demonstrating that reinstatement of the grievant is necessarily incompatible with the public policy of protecting victims of domestic violence.

Moreover, at the time that the arbitrator issued his decision reinstating the grievant to his position, not only was the grievant no longer the subject of a domestic violence protective order, but he had completed a 6 month therapeutic domestic violence offender program and had continued work beyond that course, completing a total of approximately 150 sessions. The dissent attempts to dismiss this fact by asserting that "[t]he program . . . was not a condition of the grievant's reinstatement or otherwise part of the arbitral award. The director of that program, Charles Frazier, who testified on behalf of the grievant at the arbitration hearing, stated that he was unsure whether the grievant's participation in the program was court-ordered or whether it was undertaken on the advice of counsel given the seriousness of the charges the grievant was facing at the time of his arrest." Footnote 19 of the dissenting opinion. Regardless of the reason why the grievant attended the program, the undisputed evidence was that the grievant completed 150 sessions of domestic violence offender training. We see no reason why the fact that he was not required to attend the program as a condition of reinstatement is relevant to whether he is incorrigible. Indeed, the grievant's willingness to attend the program without a court order or a requirement by his employer supports the conclusion that he was not incorrigible.

III

CONCLUSION

The state and the dissent seem to assert that the reinstatement of the grievant to his position violates public policy insofar as the university has determined that he can no longer serve in his role as its director of student conduct because students will not trust him. We recognize that reasonable people may differ as to whether reinstatement or discharge is the more appro-

priate remedy here. But both the university and the union have agreed to entrust this decision to an arbitrator. The state has not proven that there is law or legal precedent reflecting an "explicit, well-defined, and dominant public policy" to which the arbitrator's decision "run[s] contrary . . . ." *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, supra, 531 U.S. 63. In light of the foregoing, we conclude that the state has failed to meet its burden of demonstrating that enforcement of the arbitration award, reinstating the grievant's employment, violates public policy.

The judgment is reversed and the case is remanded with direction to grant the union's motion to confirm the arbitration award reinstating the grievant's employment and to deny the state's application to vacate that arbitration award.

In this opinion McDONALD, D'AURIA and ECKER, Js., concurred.